IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MEIR GELLEY                    :    CIVIL ACTION
                              :
          v.                   :
                              :
PARK PLEASANT, INC.            :    NO. 09-57

MEMORANDUM

McLaughlin, J.                          August 11, 2011

        This case involves an agreement by the plaintiff, Meir
Gelley, to purchase a nursing home facility, the facility's
assets, and certain parcels of land from the defendant, Park
Pleasant, Inc.  On January 7, 2009, the plaintiff filed suit for
breach of contract, seeking specific performance.  The defendant
answered the complaint and asserted three counterclaims: breach
of contract, misrepresentation, and quantum meruit.  The
defendant moved for summary judgment on the plaintiff's breach of
contract claim.  The plaintiff moved for summary judgment on his
breach of contract claim and the defendant's counterclaims for
breach of contract and misrepresentation.  In an order dated
February 24, 2010, the Court granted summary judgment in favor of
the plaintiff on the defendant's counterclaim for
misrepresentation, but denied summary judgment on the plaintiff's
claim and on the defendant's other counterclaims.

The Court held a bench trial on February 28 - March 7, 2011. This memorandum comprises the Court's findings of fact and conclusions of law. The Court finds for the defendant on the plaintiff's breach of contract claim. Because the defendant's counterclaim for quantum meruit is contingent on the Court's granting the plaintiff specific performance, the claim for quantum meruit is moot. The Court also finds for the plaintiff on the defendant's counterclaim for breach of contract.

I.   <u>Findings of Fact</u>

   A.   <u>Parties</u>

       1.   Plaintiff Meir Gelley is the owner and principal of Nationwide Healthcare Services, LLC ("Nationwide"), a business entity through which Gelley operates and manages nursing homes in Pennsylvania and Delaware. Bench Trial Notes of Testimony ("N.T."), 2/28/11, 62:16-21.

       2.   As of mid-2008, Nationwide owned four nursing homes: Sterling Healthcare; Brookside Healthcare; Regal Heights Healthcare; and Regency Healthcare. 2/28/11 N.T. 65:8-10.

       3.   Defendant Park Pleasant, Inc. ("Park Pleasant") is a business entity that owns and operates Park Pleasant Healthcare Facility, a 123-bed long-term skilled nursing care facility ("the Facility"), which is located in Philadelphia, Pennsylvania. Compl. ¶ 9; Purchase and Sale Agreement ("Agreement"), Ex. P-4.

4.    Nancy Kleinberg and her sister, Janet Brody, each own approximately 40 to 43 percent of Park Pleasant.  Kleinberg's two sons own the remaining shares.  Kleinberg has been the administrator of Park Pleasant since 1999.  3/2/11 N.T. 60:18-23, 61:2-3, 61:17-62:3; 3/7/11 N.T. 104:16-105:4.

B.    The Purchase and Sale Agreement

5.    On July 14, 2008, Gelley and Park Pleasant[1] executed a Purchase and Sale Agreement (the "Agreement") in which Park Pleasant agreed to sell to Gelley the Facility, certain parcels of land adjacent to the Facility (the "Land"), and substantially all of the assets of Park Pleasant related to the Facility and the Land, for $7.8 million.  The purchase price contemplated that $6.8 million was to be paid for the Facility and $1 million was to be paid for the Land.  N.T. 2/28/11 76:4-77:12; N.T. 3/2/11 49:23-50:3, 68:10-23; Agreement ¶¶ 1.28, 1.29.

6.    The Agreement required Gelley to make an initial "Deposit" of $50,000 within two business days after the execution of the Agreement, as well as an "Additional Deposit" of $250,000 "upon the conclusion" of the due diligence period.  The agreement set the end of due diligence at 5:00 P.M. on September 5, 2008.

---

[1] Kleinberg represented Park Pleasant in the negotiations with Gelley.

Until the conclusion of due diligence, Gelley maintained the right to terminate the agreement upon written notice for any reason or no reason, and be repaid his initial deposit.  The closing date was set for November 30, 2008.  Agreement ¶¶ 1.10, 1.15, 1.16, 2.2.1, 3.2.4, 8.3.

7.   The date for the close of due diligence was the product of negotiations between Park Pleasant and Gelley.  Gelley preferred a longer due diligence period, while Park Pleasant preferred a shorter period.  3/2/11 N.T. 66:17-67:1.

8.   The Agreement provided that all provisions of the agreement "shall be deemed and construed to be conditions and covenants."  Agreement ¶ 9.7.

9.   All "notices, requests, demands, claims and other communications" were required to be in writing.  Such communication was deemed to be "given" if it was sent by registered or certified mail to the other party, with a copy to the party's attorney.  The parties were also permitted to send notices and other communications via email or other method, but no such communication was considered "given" unless and until it was actually received by the intended recipient.  Agreement ¶ 9.1.

10.  The Agreement also provided that "no amendment, supplement, modification, waiver or termination of this Agreement

4

shall be binding unless executed in writing by both parties."
Agreement ¶ 9.6.

11.   Throughout the negotiation of the Agreement and
the parties' subsequent dealings, Kleinberg was represented by
attorney Michael Krekstein and Gelley was represented by attorney
Joanne Judge.  Kleinberg never gave Krekstein a power of attorney
or otherwise authorized him to sign or execute anything on her
behalf.  Likewise, Gelley never authorized Judge to sign anything
on his behalf.  2/28/11 N.T. 133:1-3; 3/2/11 N.T. 39:5-20.

12.   A party seeking to terminate the agreement was
required to give written notice to the other party.  According to
the Agreement, it could be terminated (i) by mutual written
consent, (ii) by Gelley or Park Pleasant as a result of the other
party's material breach of the contract, (iii) by Gelley, if Park
Pleasant failed to meet certain condition of the Agreement, or
(iv) by Park Pleasant, if Gelley failed to satisfy a condition of
the Agreement, including complying with all of his obligations
under the Agreement.  Agreement ¶¶ 8.1, 8.2.


C.   The Due Diligence Period

13.   As part of his due diligence, Gelley gathered and
analyzed the Facility's financial information for the previous
years.  Gelley also hired Lynn Goldstein, a registered nurse
certified as an American Association of Nurse Assessment

5

Coordinator with Select Plus, to review the case mix index
("CMI") and Medicare Resource Utilization Group ("RUG") scores
for the Facility.  Select Plus provides temporary Registered
Nurse Assessment Coordinator ("RNAC") services and oversight for
Medicare and Medicaid reimbursement in long-term care facilities.
2/28/11 N.T. 78:9-16, 79:16-80:2; 3/1/11 N.T. 107:25-108:5;
111:25-112:18.

       14.   The CMI is a numerical index that measures the
amount of services administered to the residents of the facility.
The more services a resident receives, the higher the CMI.
Medicaid reimbursement rates for skilled nursing facilities are
based on the CMI; the higher the CMI, the higher the
reimbursement.  Gelley asked Goldstein to look into the
Facility's CMI because he felt it was higher than average for the
that type of facility.  2/28/11 N.T. 80:7-15, 81:7-10.

       15.   On July 22, 2008, Goldstein visited the Facility
and met with Kleinberg and Park Pleasant's RNAC.  Goldstein
reviewed two Medicare charts, a CMI report, and a RUGS III
report.  On or about July 30, 2008, Goldstein gave Gelley an oral
and written report of her findings.  Goldstein reported that the
Facility had a high number of residents in the "rehabilitation"
category and recommended that Gelley hire a rehabilitation
specialist to engage in a thorough "rehab review" for both
Medicare and Medicaid.  Goldstein did not express any view as to

whether fraud or abuse was occurring at the Facility.  2/28/11
N.T. 158:24-159:1; 3/1/11 N.T. 115:2-116:13, 117:13-24, 119:20-
120:6, 128:5-15; Ex. P-6.

16.  Based on Goldstein's recommendation, Gelley asked
Dena Finestone, a licensed physical therapist from Tender Touch,
to review the rehabilitation practices of the Facility.
Finestone is the Vice President of Operations for Tender Touch, a
company that provides therapy services to various facilities.
2/28/11 N.T. 90:17-91:8; 3/3/11 N.T. 74:25-75:11, Ex. P-8.

17.  Gelley asked Finestone to (i) determine whether
the therapy being provided at the Facility was necessary and the
CMI was sustainable, and (ii) assuming the CMI was sustainable,
identify which of Park Pleasant's practices were contributing to
the high CMI and whether Gelley might be able to employ those
practices in his other facilities.  3/3/11 N.T. 79:3-24.

18.  Finestone and Lata Narayan, another Vice
President for Tender Touch and also a licensed physical
therapist, visited the Facility and reviewed ten patient charts.
They also spoke with an assistant administrator for Park Pleasant
about the Facility's system for screening patients to determine
if they require "rehab" services.  3/3/11 N.T. 80:15-81:6,
85:8-86:16, 128:4-12, 132:19-24.

19.  Following their review, Finestone and Narayan
called Gelley and expressed concerns about the sustainability of

7

the Facility's CMI and about some of the Facility's screening
practices.  2/28/11 N.T. 91:21-93:7; 3/3/11 N.T. 95:3-96:13,
114:2-12, 133:20-134:10.

20.  As a result of his conversation with Finestone and
Narayan, Gelley became concerned about whether he could maintain
the current CMI at the Facility, which would in turn have an
impact on revenue.  Gelley contacted Kleinberg and arranged to
meet with her to discuss his due diligence findings.  2/28/11
N.T. 93:12-94:9.


D.   The Dinner Meeting

21.  On Wednesday, August 13, 2008, Gelley and Frank
Marchese, Nationwide's General Manager, had a dinner meeting with
Kleinberg and Brody to discuss Gelley's findings and his concerns
about the CMI.  2/28/11 N.T. 94:1-24; 3/1/11 N.T. 146:3-12;
3/2/11 N.T. 75:17-76:3; 3/7/11 N.T. 108:17-23.

22.  The conversation began with Gelley expressing some
concerns about the price for the land.  Gelley informed Kleinberg
that his real estate appraisal had estimated the value of the
land to be approximately half of what Kleinberg had told him it
was worth.  Kleinberg explained that she could obtain another
appraisal and that, if they were not able to agree on a price,
the land could simply be taken out of the agreement.  2/28/11
N.T. 98:4-10; 3/2/11 N.T. 144:5-25.

23.   Gelley then raised his concerns regarding the CMI.
Gelly explained that his consultants believed some patients at
the Facility may have been receiving unnecessary therapy in order
to raise the CMI and that, if he were to take over the Facility,
he would be unable to continue this practice.  Gelley told
Kleinberg that his consultants were of the view that this
practice was likely not fraud, but could be considered "abuse."
2/28/11 N.T. 95:19-96:4; 3/2/11 N.T. 145:8-146:14.

24.   Gelley explained that if, as he predicted, he
would not be able to maintain the current CMI once he took over
the Facility, then the anticipated revenue from the Facility
would drop.  Gelley then proposed a lower purchase price for the
Facility of $5.3 million and $500,000 for the Land.  He told
Kleinberg that he did not intend to "put any more money into
this" and that she could let him know the following week whether
she agreed to the $5.3 million price he suggested.  2/28/11 N.T.
96:5-97:13; 3/2/11 N.T. 146:-149:17; 3/7/11 N.T. 112:10-18.[2]

----

[2]   There is considerable disagreement among the parties as
to what was said during this dinner.  Kleinberg testified that
she had no doubt that Gelley had refused to perform under the
contract at the agreed-upon price.  Her testimony as to what
Gelley actually said, however, was somewhat vague.  For example,
when asked whether Gelley made any "gestures" when discussing the
CMI issue, Kleinberg answered that Gelley looked like "he was
either smelling bad fish or dropping a pack of dynamite.  You
know, like, I can't do that or I'm not going ahead with this.  I
can't possibly do what you're doing.  I'm not doing this deal."
Defense counsel later asked, "Did he say words that made it clear
to you at that dinner... that he was not going to do the deal?"
Kleinberg simply responded, "Yes."  Gelley explicitly denied that

25.  Kleinberg was "blindsided" by the accusations of possible abuse.  Kleinberg responded that she did not believe that Park Pleasant was engaged in any wrongdoing with respect to the CMI.  Kleinberg knew that residents were not receiving unnecessary therapy, but was concerned that perhaps inadvertent errors had been made.  She was very alarmed and told Gelley she would investigate the issue.  3/2/11 N.T. 150:14-20, 151:1-15.

26.  Upon returning to their home after dinner, Kleinberg and Brody discussed the issues Gelley had raised. Kleinberg was less focused on the deal with Gelley at that moment and more concerned with the allegations of possible abuse. Kleinberg and Brody were aware that healthcare fraud was a serious issue and that, if the allegations were true, they could lose their license and be required to pay a fine.  3/2/11 N.T. 154:10-155:15.

---

he ever told Kleinberg that the deal was off or that she had until the following Monday to tell him whether she accepted the $5.3 million price.  While the Court found Kleinberg entirely credible, it is not clear from her testimony whether Gelley affirmatively stated that he would not proceed with the deal, or whether Kleinberg simply arrived at that impression from the tone of the conversation and Gelley's body language.  Kleinberg's only definitive response on this question came largely at the prodding of defense counsel.  Given this, as well as Gelley's firm denial, the Court cannot find that Gelley told Kleinberg he would not proceed with the deal.

E.   Park Pleasant's Investigation and Communications
     Regarding Extending the Due Diligence Period

27.   Kleinberg had plans to take one of her sons to
Florida to visit colleges that upcoming weekend.   Before leaving
for Florida, Kleinberg spoke with the RNAC for the Facility, who
assured Kleinberg that Park Pleasant was "doing everything by the
book."   Kleinberg also called several colleagues, including her
accountant and the Chief Operating Officer of the Pennsylvania
Healthcare Association, to obtain advice and solicit suggestions
for a lawyer and other experts whom she could consult.   She spoke
with a lawyer, Jack Kane, before leaving for her trip.   Kane
assured her that, from everything she was telling him, it sounded
as though Park Pleasant was not doing anything wrong.   3/2/11
N.T. 155:22-158:24.

28.   Before leaving for Florida, Kleinberg also called
Krekstein to relay the substance of her conversation with Gelley,
including his allegation of possible abuse with respect to Park
Pleasant's therapy procedures.   Kleinberg was extremely upset by
the allegation.   She explained to Krekstein that Gelley had
proposed to lower the price of the entire deal to $5.8 million.
3/2/11 N.T. 11:20-12:7, 49:6-19; 3/3/11 N.T. 3:24-4:17; Ex. P-2.

29.   The following week, Kleinberg engaged a therapy
specialist, Atul Sangal, and a reimbursement specialist, Denise
Pazano-Nolder, as independent consultants to investigate the
issues Gelley had raised.   3/2/11 N.T. 159:6-161:15.

11

30.   On Tuesday, August 19, 2008, Kleinberg sent Krekstein an email updating him on her discussions with the consultants.  She states that she would like to speak with Gelley's consultants, "but not till [sic] I have a bit more info from my sources."  Kleinberg asked Krekstein to call Gelley's lawyer and tell her that Kleinberg would be out of town and "would like to have a 3 week extension to sort this out."  Ex. P-9.

31.   Later that day, Krekstein sent Judge an email, copying Kleinberg, stating that Kleinberg "will need some time to arrange for an independent review of the issue in question." Krekstein goes on to write:

> Since the due diligence period under the Agreement of Sale is due to expire shortly, the seller would be willing to extend the time periods by three weeks as follows:
>
> 1.   Section 1.16. "Due Diligence Period" shall mean the period ending at 5:00 p.m. on September 26, 2008.
>
> 2.   Section 1.10. "Closing Date" shall mean December 31, 2008, or sooner at the discretion of the Buyer upon fifteen (15) days prior written notice to the Seller, or such other date at month-end which is mutually agreeable to Buyer and Seller. Seller shall be credited for operations for the day of Closing to midnight of such day.
>
> If these changes are acceptable to your client, please confirm the amendment of the Agreement of Sale in writing.

Ex. P-10.

32.   Judge responded a couple of hours later that she would "discuss with Mr. Gelley and get back to you."  Judge then forwarded Krekstein's email to Gelley, adding a sentence: "Do you want to give them this extension of time?"  Exs. P-10, P-11.

33.   Some back and forth between Gelley and Judge ensued regarding the extension.  In an August 20, 2008 email, Gelley wrote to Judge:

> Problem is, I wanted to have financing in place before I put down a nonrecurring amount of [sic] totaling $300,000.  However, I don't want to spend on Phase 1 extra if its [sic] not going to happen so maybe we can give her the 3 weeks but a financing contingency of another 30 days? Can u [sic] call me to discuss.

Ex. P-11.

34.   Per Gelley's instructions, Judge responded to Krekstein's email on Wednesday, August 20, 2008, copying Gelley.  Her email stated:

> Mr. Gelley is willing to give the seller time to arrange for an independent review, but does not want to spend any more money on a Phase I and other due diligence until he knows where this is going.  He would like to have 30 days after the seller has completed her review to complete the due diligence.  So, if the seller completes her review and the parties agree on terms by the end of September, Mr. Gelley would need until the end of October to complete his due diligence after which, his deposit becomes nonrefundable.

Kleinberg was not copied on this email, but Krekstein generally relayed the content of the email to her.  2/28/11 N.T. 103:21-104:21; 3/3/11 N.T. 11:25-12:9; Ex. P-12.

35.   Later that same day, Kleinberg sent Gelley an
email attempting to arrange a discussion with Finestone and
Sangal for that coming Friday.  Kleinberg wanted Sangal to speak
with Finestone to understand what it was she reviewed while
visiting the Facility that led to her concerns, so that Sangal
could more efficiently perform his own review.  Kleinberg
informed Gelley that she had mobilized two independent
consultants and a lawyer who specializes in this area, and that
their reports will help her to determine "the fair price."
Kleinberg ends the email by stating:

> I understand that you are on hold at this time as am I.
> If, at the end, the decision is still to sell to you,
> the dates will be extended by the time spent in doing
> all the independent verification.  I believe this can
> be accomplished within three weeks or, likely, even
> less.

At the time, Gelley did not forward this email to Judge.  3/1/11
N.T. 50:11-14; 3/3/11 N.T. 13:3-14:8; Ex. P-13.

36.   During their investigation, neither of Kleinberg's
consultants found evidence of impropriety in the Facility's
therapy procedures.  Both Sangal and Pazano-Nolder gave Kleinberg
favorable reports and assured her that the Facility was not
engaged in fraud or abuse.  3/3/11 N.T. 25:4-8, 26:11-22.

37.   On Wednesday, August 27, Gelley sent Kleinberg an
email stating: "Seeing that today is the 27th.  Do you want the
three week extension?"  Ex. P-15.

14

38.   A couple of hours later, Kleinberg responded to Gelley, copying Krekstein and Kleinberg's accountant, Josh Taylor.  Kleinberg proposed that Gelley and Marchese meet with her that coming Friday, August 29, to review the results of her investigation.  Kleinberg then wrote:

> At that time we can decide about the extension.  If we are going to proceed we can sign for the extension on Tuesday.  If not, we do not need an extension.... If we decide to proceed and to do the extension, the time will be extended as long as it took/takes to resolve the issue presented.

Ex. P-15.

39.   That Friday, August 29, 2008, Gelley and Marchese visited Kleinberg at the Facility.  Kleinberg relayed what her consultants had told her and confirmed that the price as outlined in the Agreement would remain the same.  Gelley did not at that time agree to pay the original price.  2/28/11 N.T. 106:1-107:1; 3/3/11 N.T. 32:17-19, 33:23-34:2.

40.   On Tuesday, September 2, 2008, Kleinberg sent Gelley an email following up on their August 29 meeting.  The email states:

> Land:  I spoke with someone on Friday who will buy the land if I wish to sell it at several hundred thousand more than the appraisal.  Thus, the land can likely come off the table.  I will also have an independent appraisal done just for my own information and will start the process this week.

> Nursing Home:  The price stands at 6.8 as everything seems OK and kosher to me.  Also, I do not want to take back any notes.  If you want to proceed at 6.8, please let me know shortly.

Experts:  If you want to speak with them I must let them know prior to your calling which is what I said on Friday.  However, unless you are going to come in at the 6.8 price once they reassure you, there is no point speaking with them.

Moving on:  No matter what your decision, there will be no problem, and anything I might be of help with in the future, just let me know.

If you need time to fully understand the issues you raised, let me know, so we can do an extension in the next day or two.  If the issues raised have significantly reduced your confidence in the financial viability, let us just end the agreement ASAP.

Call me if you have any questions or wish to tell me how you would like to proceed.

Ex. P-17.

41.  Gelley responded shortly after that he did want to speak with her consultants and asking Kleinberg to let him know when he could call them.  Ex. P-16.

42.  Kleinberg responded later that day that she would reach out to her consultants and arrange for a time for everyone to speak as soon as possible.  Gelley forwarded this email to Judge.  Ex. P-16.

43.  Kleinberg set up a telephone conference for that Thursday, September 4, 2008, for Gelley, Finestone, Narayan, Sangal, Pazano-Nolder, and Kleinberg.  3/3/11 N.T. 47:15-20.

44.  Prior to the conference call, on September 3, 2008, Judge responded to Krekstein's August 19, 2008 email offering to extend the due diligence period until September 26, 2008.  Judge copied Gelley on her email, which confirmed that

Gelley was interested in speaking with Kleinberg's consultants
and, following that discussion, he would complete due diligence.
Judge then stated:

> Therefore, the Buyer is willing to modify the time
> periods in the Agreement of Sale, but would like to
> have until Thursday, October 2, 2008, to complete the
> due diligence so that he has at least 3 weeks following
> his discussion with the consultants.  The Buyer would
> be willing to amend the Agreement of Sale as follows:
>
> 1.    Section 1.16. "Due Diligence Period" shall mean
>       the period ending at 5:00 p.m. on October 2, 2008.
>
> 2.    Section 1.10. "Closing Date" shall mean December
>       31, 2008, or sooner at the discretion of the Buyer
>       upon fifteen (15) days prior written notice to
>       Seller, or such other date at month-end which is
>       mutually agreeable to Buyer and Seller.  Seller
>       shall be credited for operations for the day of
>       Closing to midnight of such day.
>
> Please let me know if this is acceptable to the Seller.

Ex. P-18.

45.   Later that day, Kleinberg and Krekstein spoke
about Gelley's proposed extension.  Kleinberg told Krekstein that
she was not willing to extend the due diligence period until
October 2, 2008.  Kleinberg felt that extending the time for due
diligence until September 26, 2008, gave Gelley ample time to
decide whether he wanted to proceed with the purchase.  Kleinberg
told Krekstein that she was beginning to have "bad feelings"
about Gelley.  Neither Krekstein nor Kleinberg communicated to
Judge or Gelley that Kleinberg was not willing to extend the due

diligence period to October 2, 2008.  3/2/11 N.T. 22:8-23:1,
105:5-106:19; 3/3/11 N.T. 45:19-46:22; Ex. P-19.

      46.   The conference call with Gelley, Kleinberg, and
their respective consultants, took place in the afternoon of
Thursday, September 4, 2008.  Gelley was impressed with
Kleinberg's experts, and was satisfied at the end of the call
that Park Pleasant was not engaged in any improper therapy
procedures and that the CMI would not decrease as much as he had
initially predicted.  3/1/11 N.T. 67:15-17, 68:3-19.

      47.   Following their conference call, at 4:50 p.m. on
September 4, Kleinberg sent Gelley the following email:

> I have to leave, but we can speak in the morning.  You
> can let me know what conclusions you reached, if any,
> from the conversation.  In terms of the land and the
> houses, the houses and property are not included in the
> 6.8.  It is my estimate that it is worth about 150K,
> but that can be ascertained.  We can both decide
> tomorrow if we wish to move forward.

Gelley did not forward this email to Judge and did not respond to
Kleinberg.  3/1/11 N.T. 73:1-11, 75:4-8; Ex. P-20.

      48.   The morning of September 4, 2008, Gelley responded
to Judge's September 3 email to Krekstein proposing to extend due
diligence until October 2, asking Judge when the deadline was to
"get this signed."  He followed up with an email stating, "Today
or Friday?"  That evening, Judge responded: "Friday - I will call
Michael Krekstein in the morning.  He has not responded to my
email.  This is the agreement definition: "Due Diligence Period"

shall mean the period ending at 5:00 p.m. on September 5, 2008."
Exs. D-107-A10-12.

49.   Gelley responded to Judge's email by explaining
that, following the conference call, Kleinberg was not willing to
budge on the price and that he would like to sign a 30-day
extension of the due diligence period.  Ex. D-107-A13.

50.   Gelley called Kleinberg in the late morning of
Friday, September 5, 2008, to inform her that he was willing to
move forward with the Agreement at the original price of $7.8
million.  When Kleinberg pressed him as to why he had suddenly
changed his mind, Gelley explained that the conference call had
assuaged the doubts he had had regarding the CMI.  2/28/11 N.T.
111:2-18; 3/1/11 N.T. 70:19-25; 3/3/11 N.T. 55:16-56:15.[3]

51.   Kleinberg responded that she would speak with her
attorney and call him back.[4]  This conversation confirmed

---

[3]  Gelley testified that he made this call to Kleinberg on
the afternoon of September 4, following their conference call.
Kleinberg contends that the parties did not speak again after the
conference call until the following day, September 5, at which
point Gelley agreed to pay the original price.  Kleinberg's email
to Gelley the afternoon of September 4, which indicates that the
parties have not spoken since the conference call and that Gelley
has not yet told her whether he intends to pay the $7.8 million
purchase price, is consistent with Kleinberg's version of events.
3/1/11 N.T. 70:13-71:3; 3/3/11 N.T. 52:13-21; FOF ¶ 47.

[4]  Gelley alleges that when he had this conversation with
Kleinberg (on the afternoon of September 4), he told her that he
wanted to execute an agreement to extend due diligence.  He
testified that Kleinberg said they could do the extension the
next morning and that it would only take twenty minutes.
Kleinberg denies that they spoke of the extension or that she

Kleinberg's suspicions that Gelley's purported concerns regarding the CMI and the Facility's therapy practices had been insincere. It was at this point that Kleinberg lost trust in Gelley and decided she did not want to sell the Facility to him.  3/3/11 N.T. 56:17-18, 58:7-22.

52.  After ending her conversation with Gelley, Kleinberg called Brody to relay her discussion with Gelley. Kleinberg told Brody that Gelley was "not who I thought he was" and told her she no longer wanted to sell the Facility to Gelley. Brody responded that she would leave the decision up to Kleinberg and that whatever she decided with respect to Gelley was fine with her.  3/3/11 N.T. 59:13-60:2; 3/7/11 N.T. 121:10-122:1.

53.  Kleinberg then called Krekstein sometime between 1 and 2 p.m. and explained that she no longer wanted to sell the Facility to Gelley.  Kleinberg told Krekstein, "I want to be done with Mr. Gelley.... I don't want to talk.  There's no deal gonna be done.  It doesn't matter what he offers me."  She explained that she had to leave work early that day, but asked Krekstein to call Gelley's attorney.  3/3/11 N.T. 60:4-15; Ex. P-24.

54.  Meanwhile, Gelley was growing increasingly nervous that Krekstein had not responded to Judge's September 3, 2008

---

told him it would only take twenty minutes.  Gelley's recollection is inconsistent with the Court's finding with respect to when the conversation occurred and the Court also found Kleinberg's testimony on this question to be more credible. 3/1/11 N.T. 71:1-3; 3/3/11 N.T. 57:1-12.

email proposing an end of due diligence date of October 2, 2008, and that the parties had no agreement to extend the due diligence deadline.  Gelley understood that in order for any extension to be effective, it had to be signed by the parties.  As of the morning of September 5, 2008, no such extension had been signed. Judge had called Krekstein's office early that morning and had been told that Krekstein would not be in the office that day.  At 2:22 p.m. that day, Gelley sent Judge an email stating that if they did not hear from Krekstein soon, he should probably accept Krekstein's August 19, 2008 offer to extend the due diligence period until September 26, 2008.  3/1/11 N.T. 76:5-77:14; 3/3/11 N.T. 192:23-194:5; Exs. P-21, D-107-A14.

55.  After his conversation with Kleinberg, Krekstein called Judge around 2:00 p.m.  When she did not pick up, Krekstein left Judge a voicemail informing her that, since the parties had been unable to agree on a price, there was no reason to discuss an extension of the due diligence period.  Krekstein also stated that, once Gelley sent written notice of termination of the Agreement, they could continue their discussions the following week.  Krekstein stated that he would be leaving the office for the rest of the day.  3/2/11 N.T. 25:22-27:11, 56:25-57:2; Ex. P-24.[5]

---

[5] There is disagreement as to what Krekstein said in this voicemail to Judge.  Judge testified that Krekstein simply said that Kleinberg was upset following her conversation with Gelley

56.    After listening to Krekstein's message, Judge deleted the voicemail.  Judge then sent Krekstein an email at 2:22 p.m. stating, "I want to be certain that I understood your message before I talk with Mr. Gelley.  Are you withdrawing your agreement to extend due diligence until September 26?"  Judge forwarded this email to Gelley.  3/4/11 N.T. 73:11-18, 76:6-12; Ex. P-22.

57.    Judge called Gelley to discuss Krekstein's voicemail.  Judge explained to Gelley that Krekstein had indicated that Kleinberg no longer wanted to do an extension of the due diligence period.[6]  Judge advised that Gelley accept Krekstein's August 19, 2008 offer to extend the due diligence period until September 26, 2008.  When Gelley raised the possibility of wiring the $250,000 that day, Judge responded that that was not necessary and that Gelley could simply respond that

---

and that Kleinberg was no longer sure what she wanted to do. Judge alleges that Krekstein never mentioned the extension. Judge's follow-up email to Krekstein, her comments to Gelley about the contents of the voicemail, and Krekstein's notes taken at the time he left the voicemail, all conflict with Judge's version and support the account described above.  3/3/11 N.T. 194:15-195:16; 3/4/11 N.T. 73:1-7, 76:1-5.

[6] Judge denies that she told Gelley that Krekstein said Kleinberg no longer wanted to extend due diligence.  The Court finds Gelley's testimony on this issue to be more credible and consistent with the email Judge had just sent to Krekstein. 3/4/11 N.T. 74:23-75:11.

he was willing to accept the September 26, 2008 deadline.[7]
Gelley agreed to have Judge accept the September 26 deadline.
3/1/11 N.T. 78:9-81:3; 3/3/11 N.T. 198:22-199:18.

58.   At 2:50 p.m. on September 5, 2008, Judge sent
Krekstein an email, copying Gelley, responding to Krekstein's
August 19 email offering to extend due diligence until September
26, 2008.  Judge wrote:

> The buyer would still appreciate the seller's
> consideration of a further extension of the due
> [diligence] period until October 2, 2008, and
> understands that the sellers are still discussing it.
>
> In the meantime and given the lateness of the hour, the
> buyer confirms the amendment of the Agreement of Sale
> as described by you in the email below.
>
> The buyer looks forward to hearing from the seller next
> week about any further amendment of the Agreement of
> Sale with respect to the request for a one week
> extension of the due diligence period.

It was not until the following Monday, September 8, 2008, that
Krekstein opened Judge's email.  3/2/11 N.T. 57:3-7; Ex. P-23.


F.   Park Pleasant Terminates Agreement

59.   On the morning of Monday, September 8, 2008,
Gelley and Judge exchanged emails regarding whether Gelley should
commit the initial $20,000 for a Phase I audit of the Facility,
which was necessary for Gelley to obtain financing.  Gelley wrote

---

[7] Judge disputes that she and Gelley ever discussed wiring
the $250,000 that day.  The Court credits Gelley's account of
this conversation.  3/4/11 N.T. 77:23-78:4.

to Judge that he had not yet heard from Kleinberg, but that he had left her "some messages."  Gelley asked Judge, "Legally, do I have till [sic] the 26th?"  Judge replied that Krekstein had not yet answered her emails from September 5 and advised Gelley not to commit to the Phase I until the end of the day.  Ex. P-25.

60.   In the afternoon of September 8, 2008, Gelley was able to reach Kleinberg.  Kleinberg explained to Gelley her understanding that their deal was over because he had not deposited the $250,000 by September 5, 2008.  Kleinberg ended the conversation by saying that she needed to speak with her attorney.  2/28/11 N.T. 118:19-119:17.

61.   Gelley then sent Judge an email informing her that he had just spoken to Kleinberg and that she was apparently trying to "wiggle out altogether."  He states that he explained to her that he has until September 26, 2008, to make the second deposit.  Ex. P-26.

62.   Judge responded that she would wait to see what Krekstein said in response to Judge's September 5, 2008 email. She also asked Gelley whether he thought Kleinberg had found another buyer willing to pay a higher price.  Gelley answered: "It doesn't make a difference why she wants to back out in any case.  We have a contract with an extension. No?"  Judge responded: "As far as I am concerned, yes."  Ex. P-26.

24

63.   On September 10, 2008, Krekstein sent Judge a letter, copying Kleinberg.  In his letter, Krekstein states his belief that Gelley had until 5:00 p.m. on September 5, 2008, to either terminate the agreement or deposit the additional $250,000, neither of which he did.  Krekstein asserted that Judge's attempt to extend the due diligence period until September 26, 2008, by accepting Krekstein's August 19, 2008 offer, was ineffective because Judge had already rejected that offer with her counteroffer to extend due diligence until October 2, 2008.  Krekstein then stated:

> So far as we are concerned, your client is in default of the Agreement by having failed to put up his additional deposit, and this will confirm the seller's decision to terminate the Agreement.  Further, my client is not interested in reinstating the Agreement under any circumstance.

Ex. P-28.

64.   On September 12, 2008, Judge sent a response letter to Krekstein, copying Gelley.  In her letter, Judge contends that her September 5, 2008 email served to extend the due diligence period until September 26, 2008, and therefore Gelley was not in breach.  Judge does not address Krekstein's argument that her September 3, 2008 email requesting an extension until October 2, 2008, operated as a counteroffer that served to extinguish Krekstein's offer.  Ex. P-29.

65.   On September 26, 2008, Gelley made the additional $250,000 deposit into escrow.  2/28/11 N.T. 114:21-115:1.

II.  <u>Conclusions of Law</u>[8]

The plaintiff asserts that the defendant breached their contract to sell the plaintiff the Facility, the Facility's assets, and the Land, and seeks specific performance of the contract.  Park Pleasant defends that it is not in breach of their agreement because (1) Gelley repudiated the Agreement at the August 13, 2008 dinner, thereby ending their agreement; (2) Gelley failed to satisfy a condition of the agreement by making a second deposit of $250,000 by 5:00 p.m. on September 5, 2008, the date specified in the agreement as the close of due diligence; (3) even if the defendant offered to extend the due diligence period, the plaintiff made a counteroffer that extinguished any offer by the defendant; and (4) an email from the plaintiff's attorney was insufficient to amend the agreement because it was not executed in writing by both of the parties.  The defendant also asserts counterclaims for breach of contract and quantum meruit.

The plaintiff counters that (1) he did not repudiate the agreement at the August 13, 2008 dinner; (2) even if he did repudiate, the defendant renewed its offer to sell the Facility to the plaintiff and the plaintiff accepted that offer; (3) any alleged oral repudiation by the plaintiff was ineffective by

---

[8] Reference to the above Findings of Fact shall be abbreviated "FOF."

itself to terminate the agreement; (4) time was not of the essence in the agreement, such that the plaintiff did not need to meet the September 5 deadline for the additional deposit, and any breach by the plaintiff was immaterial and cured; (5) even if time was of the essence, it was waived by the defendant's conduct; (6) the parties agreed to extend the deadline for the second deposit until September 26, 2008; and (7) the defendant never properly terminated the Agreement.

### A.    Plaintiff's Breach of Contract Claim

The parties agree that Pennsylvania law governs these claims.  A cause of action for breach of contract in Pennsylvania requires that the plaintiff establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.  Gorski v. Smith, 812 A.2d 683, 692 (Pa. Super. 2002).  The parties here had a valid contract and, if the defendant did breach the contract, the plaintiff suffered damages, as he was deprived of the right to buy the Facility, corresponding assets, and the Land.  The central question is whether the defendant, by refusing to sell to the plaintiff, breached the parties' Agreement.  For the reasons set forth below, the Court finds for Park Pleasant on this claim.

1.   Whether Gelley Repudiated the Contract

To constitute anticipatory breach under Pennsylvania law, there must be "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." McClelland v. New Amsterdam Cas. Co., 185 A. 198, 200 (Pa. 1936). "Mere expression of doubt as to... willingness or ability to perform is not enough to constitute a repudiation." Edwards v. Wyatt, 335 F.3d 261, 273 (3d Cir. 2003) (quoting Restatement (Second) of Contracts § 250 cmt. b (1981)). The Court does not find that Gelley's statements at the August 13, 2008 dinner amounted to an affirmative repudiation of the Agreement. Although Gelley's statements may have raised serious doubts about his willingness to perform, the Court is not convinced that they amounted to an "absolute and unequivocal" refusal to perform under the contract. The parties' communications and conduct following the meeting also indicate that the parties were contemplating a modification of the existing Agreement, as opposed to executing an entirely new agreement. FOF ¶¶ 23, 24, 30-35, 37, 40, 44, 45, 63.

Regardless of whether Gelley repudiated the Agreement, however, the parties did not thereafter terminate the Agreement in writing, as is required by the terms of the contract. Pursuant to section 8.1.1(ii), Park Pleasant could terminate the Agreement if Gelley committed a material breach of the Agreement.

28

To terminate the Agreement, however, Park Pleasant would have needed to do so according to the "Procedure for Termination" provisions, which provide: "A party terminating this Agreement pursuant to Section 8.1 shall give written notice thereof to each other party hereto..." Agreement ¶ 8.2. There is no evidence that Park Pleasant sent any such notice to Gelley, or vice-versa, following the August 13, 2008 dinner. Therefore, the Court finds that any statements made by Gelley during the August 13, 2008 dinner did not, by themselves, terminate the Agreement.

> 2.  Whether Park Pleasant Waived the September 5 Deadline

The plaintiff does not dispute that he did not make the second deposit until after September 5, 2008. He argues, however, that time was not of the essence in this agreement, and that the three-week delay in making the second deposit does not amount to a material breach. Even if failure to make the deposit by September 5 was a breach, the plaintiff asserts that he cured that breach on September 26, 2008. Finally, the plaintiff contends that, even if time was of the essence, Park Pleasant, by its conduct, waived any time is of the essence condition.

The defendant asserts that even though the language "time is of the essence" is not included in the Agreement, the second payment by the close of the due diligence period was a condition of the Agreement. The defendant also argues that the

29

Agreement was an option contract and time is of the essence in all option contracts.  The defendant denies that Park Pleasant's conduct constituted a waiver of any "time is of the essence" condition.

The Court need not determine whether time was of the essence or whether the plaintiff's breach was material, because payment of the second deposit by the close of due diligence was an explicit condition of the agreement and failure to satisfy a condition allowed for termination.[9]  The Agreement provides that all provisions in the agreement "shall be deemed and construed to be 'conditions' and 'convenants.'"  Agreement ¶ 9.7.  The requirement that the second deposit be paid by the close of due diligence was, therefore, a condition of the Agreement.  Under the terms of the contract, Gelley's failure to comply with any condition gave Park Pleasant the right to terminate their agreement.  Agreement ¶¶ 3.6, 3.7., 8.1(iv).  Likewise, the plaintiff's argument that he cured any breach is equally unavailing because the defendant would still have been within its

_____

[9] The Court is unpersuaded by the plaintiff's argument that the contract did not specify a time for the second deposit. 6/13/11 Tr. Closing Arg. ("Closing") 23:15-17.  The Agreement requires that the second deposit be made by Gelley "upon the conclusion of the Due Diligence Period."  Agreement ¶¶ 1.15, 2.2.1.  The Due Diligence Period is defined as "the period ending at 5:00 p.m. on September 5, 2008."  Agreement ¶ 1.16.  This language creates an unambiguous requirement that the second deposit be made on or before 5:00 p.m. on September 5, 2008. This was also clearly the understanding of the parties and their respective attorneys.  FOF ¶¶ 31, 33, 34, 37, 44, 48, 54.

rights to terminate the Agreement and there is no requirement in the contract that either party give the other time to cure.[10]

The Court also finds that the defendant did not waive the condition that Gelley was required to make his second deposit by September 5, 2008. Under Pennsylvania law, conduct sufficient to convince a buyer that a seller would not insist on a specified date in a contract waives an explicit "time is of the essence provision." Cohn v. Weiss, 51 A.2d 740, 742 (Pa. 1947). In order to succeed on his theory that the defendant waived this condition and should now be estopped from insisting that the plaintiff had to make his second deposit by September 5, the plaintiff must show that he was misled and prejudiced by the defendant's conduct. Nat'l Data Payment Sys., Inc. v. Meridian Bank, 212 F.3d 849, 855 (3d Cir. 2000).

Cohn involved a sale-of-property contract in which time was of the essence and a real estate settlement date was set for

---

[10] Although not necessary to its decision, the Court notes that the Agreement was not an option contract. "An option is a contract to keep an offer open.... It contemplates a subsequent contract of sale, which will, however, only arise if the optionee elects to exercise his option rights by accepting the offer." Warner Bros. Theaters v. Proffitt, 198 A. 56, 57-58 (Pa. 1938). Here, the parties executed a Purchase and Sale Agreement, not an option to create a subsequent contract, and the Agreement set forth obligations for both the buyer and the seller. Furthermore, the "option" did not expire at a specific deadline. Under the terms of the agreement, the parties had to execute written notice in order to terminate the Agreement. Agreement ¶¶ 3.2.4, 8.2.

December 26.  Various complications, including the illness of the
seller's son, arose as the settlement date approached, and the
buyer asked the seller whether the date could be moved until
December 29.  The seller responded that he would let the buyer
know by the morning of December 27.  Once the December 26
deadline had passed, however, the seller informed the buyer that
he was no longer willing to sell.  The Pennsylvania Supreme Court
found that the seller had used the pretext of his son's illness
to trick the buyer into thinking that his mind was not on the
property transaction and held that the seller was estopped from
terminating the deal because he had deliberately lulled the buyer
into thinking he would not insist on the December 26 date.

        The Court finds that the situation in <u>Cohn</u> is
distinguishable.  The plaintiff points to Kleinberg's various
emails to Gelley between August 20 and September 5, 2008, as well
as their telephone conversations during this period, as evidence
that Kleinberg led Gelley reasonably to believe that Park
Pleasant would not demand the second deposit by the September 5
deadline.  Critically, however, in all of her communications with
Gelley regarding extending the due diligence period, Kleinberg
made it clear that such an extension was conditional on their
mutual agreement to move forward with the Agreement.  On August
20, 2008, Kleinberg wrote to Gelley that she knew they were both
"on hold," but that "[i]f, at the end, the decision is still to

sell to you, the date will be extended by the time spent in doing all the independent verification."  In her August 27, 2008 email responding to Gelley's inquiry about an extension, Kleinberg proposed that they meet that coming Friday and decide at that time "about the extension."  She stated that "if" the parties decide to proceed, they could "sign for an extension on Tuesday [September 2]," but that otherwise, there was no point in agreeing to an extension.  FOF ¶¶ 35, 38.

On September 2, 2008, Kleinberg stated in her email to Gelley that "[i]f" he needed more time to consider the issues he had raised regarding the CMI, he should let her know so that they could "do an extension in the next day or two."  In her final email to Gelley, the afternoon of September 4, Kleinberg stated: "We can both decide tomorrow if we wish to move forward."  FOF ¶¶ 40, 47.

At no point did Kleinberg mislead Gelley into believing that the September 5 deadline for the second deposit was not a hard date and that she had waived that condition.  Kleinberg made an extension expressly conditional on their agreement to move forward with the sale at a certain price.  Regardless of whether Kleinberg was correct in her belief that they were both entitled to decide whether to proceed with the deal prior to September 5, Kleinberg's emails made it sufficiently clear that she had not agreed to an extension and still believed that due diligence

ended on September 5, 2008.  Indeed, Kleinberg's repeated references to "doing" or "signing for" an extension should have made it clear to Gelley that Kleinberg understood that no extension would be effective until the parties executed a written amendment to the Agreement and that she was expressly reserving her right not to agree to an extension.  It was not reasonable, therefore, for Gelley to believe that Kleinberg would not insist on the September 5 deadline for the second deposit.

Furthermore, the evidence indicates that Gelly was not in fact duped into believing that Kleinberg had waived the September 5 deadline.  Gelly emailed Judge the morning of September 4 to inquire about the deadline for signing an extension of the due diligence period, asking whether it was that day or Friday, September 5.  Judge responded that the deadline for signing any extension was 5:00 p.m. on September 5, 2008.  By late morning on September 5, Gelley had begun to grow nervous that he had not heard back from Kleinberg and Krekstein had not responded to Judge's September 3 email.  Gelley sent Judge an email that afternoon stating that, if they did not hear from Krekstein soon, they should simply accept Krekstein's offer to extend due diligence until September 26.  Gelley understood at the time that, in order for any extension to be effective, it had to be signed by the parties.  His anxiety resulted from the fact that the parties still had not executed a written extension and

he was concerned about the ramifications of letting September 5 pass without such an agreement.  Gelley was evidently not lulled into believing that Kleinberg would not insist on the second deposit by September 5.  FOF ¶¶ 48, 54.

Finally, although not essential to the Court's conclusion, it is significant that Krekstein left Judge a voicemail on the afternoon of September 5, informing her that there was no reason to extend the due diligence period.  Judge's response, which she immediately forwarded to Gelley, was to inquire whether she correctly understood that Krekstein was withdrawing his offer to extend due diligence until September 26.  To the extent that Gelley still harbored any illusion that Kleinberg would not insist on the September 5 deadline, this voicemail and Judge's email should have extinguished it.  FOF ¶¶ 55-57.

Unlike the situation in Cohn, Kleinberg did not engage in conduct sufficient to convince Gelley that she would not require strict performance and, in fact, Gelley was not so misled.  That Kleinberg did not affirmatively communicate to Gelley that she would insist on the September 5 deadline does not absolve him of his responsibility to perform in accordance with the contract terms.  Unless Kleinberg had indicated that she would waive the condition, she was under no obligation to inform Gelley that she intended to insist on strict compliance with the

35

deadline for the second deposit.  See Nat'l Data, 212 F.3d at 856
(citing New Eastwick Corp. v. Phila. Builders Eastwick Corp., 241
A.2d 766, 769 (Pa. 1968) (holding that a party who simply remains
silent and allows a termination date to pass is not estopped from
exercising its option to terminate)).

       3.    Whether the Parties Extended the Due Diligence
            Period

      The Court also finds that the parties did not agree to
extend the due diligence period beyond September 5, 2008.  The
Agreement provides that "no amendment, supplement,
modification... of this Agreement shall be binding unless
executed in writing by both parties hereto."  Agreement ¶ 9.6.  A
written contract may, however, be modified by words or conduct.
First Nat'l Bank v. Lincoln Nat'l Life Ins. Co., 824 F.2d 277,
280 (3d Cir. 1987).  Even an agreement prohibiting non-written
modifications may be modified by a subsequent oral agreement if
the parties' conduct clearly shows an intent to waive the
requirement that amendments be in writing.  Accu-Weather, Inc. v.
Prospect Commc'ns, Inc., 644 A.2d 1251, 1255 (Pa. Super. 1994).

      The plaintiff contends that the parties agreed in
writing to an extension of the due diligence period until
September 26, 2008, because (1) the defendant waived the
condition that the extension had to be executed in writing by the
parties themselves when Krekstein stated in his August 19 email

to Judge that, if the offer to extend due diligence until September 26 was acceptable, Judge should "confirm the amendment of the Agreement of Sale in writing"; (2) Krekstein had apparent authority to offer an extension of the due diligence period and did in fact do so in his August 19 email; (3) Judge's August 20 and September 3 emails were not counteroffers; and (4) Judge's September 5 email to Krekstein accepting the terms of his August 19 offer operated to extend the due diligence period until September 26, 2008.

The Court need not address whether the defendant waived the requirements of ¶ 9.6 for modifying the agreement or whether Krekstein's August 19 email operated as an effective offer to extend due diligence, because it finds that Judge's September 3 email to Krekstein was a counteroffer that extinguished any offer Krekstein might have made to extend due diligence. The Second Restatement defines a counteroffer as "an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer." Restatement (Second) of Contracts § 39. See also First Home Sav. Bank, FSB v. Nernberg, 648 A.2d 9, 15 (Pa. Super. 1994). Generally, a counteroffer will terminate the offeree's power of acceptance. Restatement (Second) of Contracts § 39. A mere inquiry regarding the possibility of different terms, a request for a better offer, or

a comment upon the terms of the offer, is ordinarily not a
counteroffer.  Id. cmt. b.

On August 19, 2008, Krekstein sent Judge an email
purporting to offer an extension of the due diligence period by
copying sections 1.16 and 1.10 from the Agreement, but amending
the dates for the end of due diligence and closing.  On August
20, Judge responded that Gelley "would like to have 30 days after
the seller has completed her review to complete the due
diligence."  On September 3, Judge responded to the same August
19 email from Krekstein, copying his language from sections 1.16
and 1.10, but proposing different dates, including an extension
of the due diligence period until October 2, 2008.  FOF ¶¶ 31,
44.

The August 20 email most likely did not operate as a
counteroffer, as it is more akin to an inquiry or comment upon
the terms of the offer.  Judge's September 3 email, however, was
a counteroffer.  The September 3 email dealt with the same
subject matter as Krekstein's purported offer and proposed a
substituted bargain.  Judge's email even mirrored the form of
Krekstein's offer, changing only the dates in question.  Judge
clearly states that Gelley would consider modifying the time
periods, "but" he proposes to do so under different terms.  Her
email was not a mere inquiry into the possibility of other terms,
but an unambiguous counteroffer.  Gelley or Judge's power to

38

accept Krekstein's offer was therefore terminated and Judge's September 5 email purporting to accept Krekstein's offer could not have created a valid agreement to extend due diligence until September 26.

As a result, the Court finds that the plaintiff failed to satisfy a condition of the Agreement - a second deposit of $250,000 by 5:00 p.m. on September 5, 2008 - and the defendant was therefore entitled to terminate the parties' agreement.

> 4.   Whether Park Pleasant Properly Terminated the Agreement

The plaintiff also argues that, even if he failed to satisfy a condition of the Agreement, the defendant did not terminate the agreement in accordance with the terms of the contract.  Specifically, the plaintiff asserts that Krekstein's September 10, 2008 letter purporting to "confirm the seller's decision to terminate the Agreement" was not an effective notice of termination because it was not sent to Gelley, but to Judge.

The Agreement provides that if Gelley fails to comply with a condition of the Agreement, Park Pleasant shall have "as its sole remedy" the right to either waive the condition and proceed to closing or terminate the agreement.  Agreement ¶ 3.7. The Agreement also sets forth the procedure for termination, which requires that any party terminating the agreement "give written notice thereof to each other party hereto, whereupon this

39

Agreement shall terminate."  Agreement ¶ 8.2.[11]  The section

entitled "Notices" provides that any "notice, request, demand,

claim or other communication" must be in writing and shall be

deemed "given" if it is sent by mail or overnight delivery

service to the other party, with a copy to his or her attorney.

Agreement ¶ 9.1.  The parties could also communicate via email or

other method, but no such communication was considered "given"

unless and until it was actually received by the intended

recipient.  Id.

The September 10 letter was sent by Krekstein to Judge,

with a copy to Kleinberg.  On or before September 12, 2008, Judge

shared the contents of the letter with Mr. Gelley.  The plaintiff

contends that, because this letter was not sent directly to him,

it fails to comply with the provisions of the Agreement regarding

notices, and therefore was not effective to terminate the

Agreement.[12]  The plaintiff does not dispute that he received

---

[11] The plaintiff also cites to section 9.6, which states:
"No amendment, supplement, modification, waiver or termination of
this Agreement shall be binding unless executed in writing by
both parties hereto."  To the extent that this provision
conflicts with sections 8.1. and 8.2, which explicitly govern
conditions and procedures for termination and allow for
unilateral written notice of termination under certain
circumstances, the Court finds that sections 8.1 and 8.2 control,
and section 9.6 would not invalidate termination.  See Baltic
Dev. Co. v. Jiffy Enter., Inc., 257 A.2d 541, 543 (Pa. 1969) ("It
is a well known rule of constructifon that the specific controls
the general.").

[12] Krekstein testified that this letter was not intended as
a termination letter pursuant to the Agreement, but rather was

40

actual notice of Park Pleasant's termination within days of the
September 10 letter's mailing or that he was prejudiced in any
way by Krekstein's failure to send the letter directly to him, as
opposed to sending it only to Judge.  FOF ¶¶ 63, 64; Ex. P-29
(September 12, 2008 Letter from Judge stating: "I received your
letter of September 10, 2008, and have reviewed it with Mr.
Gelley.").

     In Pennsylvania, conditions precedent to a contract
termination must be strictly fulfilled.  Accu-Weather, 644 A.2d
at 1254.  Notice to terminate a contract must be clear and
unambiguous.  Id.  The September 10, 2008 letter from Krekstein
complied with the termination procedure set forth in section 8.2
because it gave "written notice" of termination to Gelley.
Although the letter did not strictly comply with the Notices
provision because it was sent to Judge and not Gelley, the Court
finds that such a purely technical deficiency will not void
termination where the terminating party was within its rights to

---

meant to "confirm[] [the parties'] decision to terminate."
According to Krekstein, the agreement had already been terminated
when the parties no longer agreed on certain key terms, such as
price, and the parties were simply engaging in negotiations over
a new agreement, which never came into being.  3/2/11 N.T. 31:11-
32:18.  As noted previously, the Court is not persuaded that the
parties were engaged in negotiations over an entirely new
agreement, as opposed to a modification of the original
agreement.  The logical reading of the September 10 letter is
that it was intended to serve as notice to Gelley of Park
Pleasant's intent to terminate the Agreement after he failed to
make his second deposit by September 5, 2008.

terminate after the buyer failed to comply with a condition of the contract, the notice was written as required by the Agreement, and Gelley in fact received and reviewed the termination letter almost immediately.

Unlike the cases cited by the plaintiff for the proposition that all procedures for termination must be strictly fulfilled, the termination letter here was clear and unambiguous, the plaintiff received actual notice of termination - in fact, he reviewed the letter with Judge when she received it - and the plaintiff has not argued that he suffered any prejudice whatsoever as a result of receiving the letter via Judge and not directly. See Accu-Weather, 644 A.2d at 1255; Mextel, Inc. v. Air-Shields, Inc., 2005 WL 226112, *20 (E.D. Pa. Jan. 31, 2005). As such, the September 10, 2008 letter was effective to terminate the agreement.

It also appears from the parties' communications leading up to September 5, 2008, that the plaintiff waived strict compliance with this requirement of the Notices provision. A course of performance by one party accepted or acquiesced in without objection by the other may be evidence of an agreement to modify or a waiver of a written term. Agathos v. Starlite Motel, 977 F.2d 1500, 1509 (3d Cir. 1992); Restatement (Second) of Contracts § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the

42

nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").

Since at least August 19, 2008, Judge and Krekstein repeatedly communicated and negotiated directly with one another without ever copying the other party to the contract.  On August 19, Krekstein emailed Judge an offer to extend due diligence, but did not copy Gelley.  Not only did Judge not object, she responded to Krekstein with a counteroffer and copied Gelley, but not Kleinberg.  Indeed, the very email on September 5, 2008, from Judge to Krekstein, that purports to accept the offer to extend due diligence and thereby modify the agreement, was not sent to Kleinberg.  The plaintiff argues on the one hand that he effectively extended due diligence with Judge's September 5 email to Krekstein and in the same breath asserts that the termination letter was invalid because it was not sent to him.  In fact, various emails pertaining to critical negotiations regarding the contract demonstrate that the parties had in fact acquiesced and participated in a course of dealing that allowed their attorneys to send communications to the other party's attorney, with the understanding that each attorney would then consult with his or her client.  It would be unfair to now demand that Krekstein strictly comply with this technical aspect of the Notices

provision when the parties had continually indicated a
willingness to forgo it.[13]  Exs. P-10, 11, 12, 18, 22, 23, 29;
FOF ¶¶ 30-34, 44, 45, 55, 56, 57, 58, 64.


    B.   Defendant's Counterclaims

        1.   Quantum Meruit

        In the event the Court found for the plaintiff and
granted specific performance, the defendant sought not only the
original purchase price, but also the additional value of
investments, upgrades and improvements since September 5, 2008.
Because the Court finds in favor of the defendant on the
plaintiff's breach of contract claim, the defendant's claim for
quantum meruit is moot.


        2.   Breach of Contract

        The defendant asserts that Gelley breached the
Agreement when he failed to make the second deposit by September
5, 2008.  A party's failure to satisfy a condition of a contract,
as opposed to a promise, may prevent that party from acquiring a

---

[13] The Court also notes that, although it was the lawyers
who were engaged in this practice, the parties themselves were
fully aware of and accepted this course of dealing.  The lawyers
would often forward these emails or relay their substance to
their clients, who would then instruct them on how to respond.
At no point did anyone express any reservations about the fact
that they or the other party were not copied on certain
communications.  Ex. P-11; FOF ¶¶ 30, 32-34, 44, 45, 48, 56, 57,
58, 64.

right, but does not give rise to liability for breach of
contract.  <u>Castle v. Cohen</u>, 840 F.2d 173, 177 (3d Cir. 1988);
Restatement (Second) of Contracts § 225(3).  The terms of the
Agreement accorded Gelley the right to purchase the Facility and
the Land if he made a second deposit by 5:00 p.m. on September 5,
2008, and also allowed him to reclaim his initial deposit if he
terminated in writing prior to that time.  His failure to do
either of those things amounted to a failure to perform certain
conditions, not a breach of the contract.[14]  The Court finds for
the plaintiff on this claim.[15]

      An appropriate order follows.

---

[14]  As to the distinction between a condition and a promise,
see generally 13 Richard A. Lord, Williston on Contracts § 38:5
(4th ed.) ("A promise is a manifestation of an intention to act
or refrain from acting in a specified way, so made as to justify
the promisee in understanding that a commitment has been made,
while a condition is an event, <u>not certain to occur</u>, which must
occur... before performance under a contract becomes due.")
(emphasis added).  Breach of a promise subjects the promisor to
liability in damages, but will not necessarily excuse performance
on the other side.  <u>Castle</u>, 840 F.2d at 177.

[15]  As it was not asked to make a judgment as to the fate of
the initial and additional deposits, the Court takes no view as
to whether, under the contract terms, Park Pleasant or Gelley is
entitled to keep any or all of the $300,000 currently in escrow.
The Court assumes the parties are able to resolve this issue per
the terms of the Agreement.